ESTATE OF ROBERT CITRINO, DECEASED, SAMUEL S. SAIBER, ADMINISTRATOR, AND M. LISBETH CITRINO, ET. AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Citrino v. Commissioner
Docket Nos. 5974-83; 5975-83; 29520-83.
United States Tax Court
T.C. Memo 1987-565; 1987 Tax Ct. Memo LEXIS 563; 54 T.C.M. (CCH) 1067; T.C.M. (RIA) 87565; 98 Oil & Gas Rep. 411; November 12, 1987. Winthrop Drake Thies, for the petitioners. Edward G. Martoglio and Caroline R. Ades, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax for the calendar year 1977 as follows: Petitioners
Amount
Estate of Robert Citrino, Deceased,
Samuel S. Saiber, Administrator,
and M. Lisbeth Citrino
(docket No. 5974-83)
$ 9,708.00
Stanley Wyman and Jean Wyman
(docket No. 5975-83)
$ 5,597.00
Lewis Fromkin and Elaine Fromkin
(docket No. 29520-83)
$ 5,790.14
*567 The issues for decision are: (1) Whether Central Associates, a Pennsylvania limited partnership formed December 30, 1977, was an activity not engaged in for profit within the meaning of section 183; [2] and (2) In a situation where a timely petition was filed, whether the assessment and collection of the deficiency determined against the Estate of Robert Citrino is barred by the statute of limitations because the estate's administrator, who had previously filed a Notice Concerning Fiduciary Relationship pursuant to section 6903, was not mailed a copy of the deficiency notice. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Samuel S. Saiber, Administrator of the Estate of Robert Citrino, had his office in Newark, New Jersey, and petitioner M. Lisbeth Citrino resided in Secaucus, New Jersey, on the date the *568 joint petition was filed in this case. Petitioners Stanley Wyman and Jean Wyman, husband and wife, resided in Springfield, New Jersey, on the date they filed their petition in this case. Petitioners Lewis Fromkin and Elaine Fromkin, husband and wife, resided in East Brunswick, New Jersey, on the date they filed their petition in this case. Robert Citrino, Stanley Wyman, and Lewis Fromkin each filed a joint Federal income tax return (Form 1040) with his spouse for the calendar year 1977. [3] Petitioners M. Lisbeth Citrino, Jean Wyman, and Elaine Fromkin are parties in this case solely because they filed joint income tax returns with their husbands during the year in issue. All further references to "petitioners" are to Robert Citrino, Stanley Wyman, and Lewis Fromkin in their capacity as limited partners in the Central Associates partnership. On December 30, 1977, Central Associates was organized under the laws of Pennsylvania as a limited partnership. [4] Central Associates (sometimes hereinafter referred to *569 as the partnership) was formed to drill oil and gas wells, and to produce and sell the production of such wells. Central Associates was composed of one general partner and eight limited partners. The general partner was Compass Development, Inc., a Pennsylvania corporation whose president and sole shareholder was John Pfauth. Compass Development was a drilling company. The eight limited partners were Stanley Wyman, Lewis Fromkin, Robert Citrino, William Balsam, Thomas DiBiasi, Joseph Menker, Herbert Bressman, and Winthrop Drake Thies, a group of close friends, relatives and business associates. Joseph Menker and Herbert Bressman were friends of Wyman and Fromkin, respectively. William Balsam was Fromkin's brother-in-law, and Robert Citrino and Thomas DiBiasi were partners in the practice of law with Balsam. Winthrop Drake Thies was tax counsel to several partnerships that Wyman was involved in. *570 Petitioner Stanley Wyman and Mr. Pfauth structured the transaction involved in this case. Petitioners Stanley Wyman and Lewis Fromkin formed Central Associates. Earlier in 1977, before the formation of Central Associates, Fromkin and Wyman were engaged in forming and marketing limited partnership offerings for partnerships to be associated with Compass Development and others. They also formed Fromkin-Wyman Associates, Inc., which was a company hired by Compass Development as a management consultant to coordinate relations between Compass Development and third parties in various oil and gas ventures for which Compass Development was the driller. During the years prior to their association, Wyman had been in the financial planning field and Fromkin had been in the real estate construction industry. Wyman's first involvement with John Pfauth, president of Compass Development, was in 1976, and he had been involved in approximately seven drilling ventures with Pfauth prior to December of 1977. The record contains no evidence as to the nature of these prior ventures with Pfauth. In December of 1976, Wyman and Pfauth had formed Oil Resources Management Corporation to be the leasing *571 agent responsible for locating and acquiring the rights to oil and gas leases, and to be the general partner in at least one limited partnership. However, Central Associates was Wyman's first personal investment in an oil and gas drilling venture. Fromkin's first involvement in an oil and gas drilling venture was with Pfauth and Wyman in June of 1977. Similarly, the record contains no evidence as to the nature of this prior venture, and it also appears that Central Associates was Fromkin's first personal investment in an oil and gas drilling venture. Central Associates was formed on December 30, 1977. No prospectus or other form of investment memorandum describing the limited partnership or outlining its benefits was prepared. Wyman and Fromkin offered limited partnership interests in Central Associates only to a small, inside group of their relatives, friends, and close business associates. The partnership agreement, also dated December 30, 1977, states that the partnership's principal business is the drilling of wells for oil and/or gas on certain leases to be contributed by the general partner, Compass Development. The contribution of the leasehold interest described below *572 was Compass Development's sole contribution, as general partner, to the capital of the partnership. A document entitled "Assignment of Oil and Gas Lease" was executed on December 30, 1977. This document purported to transfer Compass Development's leasehold interest in a certain oil and gas lease on land located in Forest County, Pennsylvania, to Central Associates. The document is signed by John Pfauth, president of Compass Development, as assignor, and also by John Pfauth, president of Compass Development, general partner of Central Associates, as assignee. [5] Paragraph four of the document states that the assignee (Central Associates) agrees not to drill any oil or gas well except by contracting with the assignor (Compass Development) to do such drilling work for assignor's "then current rates, provided that its charges be comparable to charges by others for like work." Pfauth apparently offered a number of different leases or portions of leases from among which Wyman could make a choice. Wyman indicated that he chose the one described in the assignment because of its proximity to prior projects that had been successful. There is no evidence in the record as to these allegedly *573 successful projects. Section 4.1 of the partnership agreement provided that the management of the partnership shall be carried on by the general partner. It further provided that the general partner shall have full and exclusive authority and responsibility to manage and control all the affairs and business of the partnership. [6] Section 5.3 of the partnership agreement stated that no limited partner shall take part in the management of, or transact any business for or on behalf of, the partnership. [7] Section 10.1 of the partnership agreement provided that the partnership would dissolve and terminate upon, among other things, the bankruptcy, insolvency, or dissolution of the general partner. *574 The partnership agreement required the limited partners to make the following capital contributions to the partnership: Percentage
Capital Contribution
Limited Partner
Interest [8]
Cash
Note
Total
Lewis Fromkin
9%  $  8,000
$  18,000
$  26,000
Stanley Wyman
9%  8,000
18,000
26,000
William Balsam
18%  16,000
36,000
52,000
Robert J. Citrino
9%  8,000
18,000
26,000
Thomas DiBiasi
9%  8,000
18,000
26,000
Joseph Menker
13.5%
12,000
27,000
39,000
Winthrop Drake
Thies
4.5%
4,000
9,000
13,000
Herbert Bressman
9%  8,000
18,000
26,000
81%  $ 72,000
$ 162,000
$ 234,000
*575 The only documentary evidence by petitioners to establish payment of the cash contributions is copies of two canceled checks payable to Central Associates, one from Wyman, dated December 22, 1977, and one from Fromkin, dated December 21, 1977, each in the amount of $ 8,000. No other books or records, bank statements, deposit slips, or canceled checks were offered by petitioners regarding the other limited partners' cash contributions. [9]
Petitioners each executed a recourse promissory note for the balance of his capital contribution to the partnership. [10] Under *576 the terms of the notes, the principal amount, together with interest accrued at a rate of eight percent per annum, was due on December 31, 1982. Thus, no payments of either principal or interest were due on the notes for five years, except from any production from the wells. [11]
*577 Also on December 30, 1977, Central Associates and Compass Development executed a document entitled Turnkey Drilling Agreement. The purpose of a "turnkey" drilling agreement is to fix the cost of drilling the wells at a certain amount. Under the terms of this drilling agreement, Compass Development agreed to drill up to nine oil and gas wells for Central Associates on the leasehold interest that Compass Development had assigned to Central Associates. The drilling agreement provided that "The Partnership will give notice to the Driller from time to time, but in no event later than December 28, 1977 [two days before Central Associates was formed] of the number of wells (in not less than sets of three) to be drilled and completed hereunder." Of the nine wells to be drilled, six were to be producing wells and three were to be injection wells. [12]Compass Development agreed to complete "all or a substantial portion of its work hereunder on or before December 31, 1977, and fully complete all of its work no later than December 31, 1978, time being of the essence in both instances." *578 In return for Compass Development's performance, the Turnkey Drilling Agreement provided that Central Associates agreed to pay Compass Development the sum of $ 30,000 for each producing well with Minimum Reserves and each completed injection well. "Minimum Reserves" was defined in the agreement as the estimated oil reserves in place in a producing well which have, based on the logs of the logging company, [13] a commercial value of at least $ 150,000 calculated at the rate of $ 14.77 per barrel (or at such higher price as shall then be commercially and lawfully paid for such oil). In the event that a producing well did not have Minimum Reserves, Compass Development covenanted to drill a substitute well or wells, as the case may be, so that each producing well contracted for had the required Minimum Reserves. *579 Central Associates agreed to pay Compass Development the $ 30,000 price for each of the nine wells to be drilled as follows. The sum of $ 8,000 per well was to be paid in cash or good check of Central Associates no later than December 30, 1977. [14] The agreement stated that this amount was attributable to the intangible or noncapital costs of drilling the wells. There is no evidence in the record to establish that any amount of money was ever transferred from Central Associates to Compass Development pursuant to this provision of the Turnkey Drilling Agreement. See nn. 9, 10, supra.
According to the drilling agreement, the balance of the $ 30,000 price per well was to be paid by Central Associates with promissory notes. The sum of $ 18,000 per well was to be paid by the delivery to Compass Development on or before December 30, 1977 of Central Associates' Non-Capital Note. This note, recourse on its face and payable to Compass Development, *580 was dated December 30, 1977, and was signed by John Pfauth in his capacity as president of Compass Development, the general partner of Central Associates. Under the terms of the note, Central Associates agreed to pay Compass Development the sum of $ 162,000 ($ 18,000 per well times nine wells) together with interest at the rate of eight percent. The total principal and interest was due Compass Development on December 31, 1982. Thus, no payments of either principal or interest were due on the note for five years, except possibly from production from the wells. See n. 15, infra. Payment of this note was secured by the collateral assignment to Compass Development of the promissory notes executed by the limited partners as part of their capital contributions, which notes were also due on December 31, 1982, except to the extent prepaid by production from the wells. [15] In the event of a default by the partnership on the $ 162,000 note, Compass Development agreed in the Turnkey Drilling Agreement to look for payment first to the individual limited partners' notes, which also totaled $ 162,000 in the aggregate. Such default could not occur until December 31, 1982, or at least no *581 liability could arise on the part of the limited partners before December 31, 1982, except possibly as to payments from production. The balance of $ 4,000 per well was to be paid by the delivery of Central Associates' Capital Note to Compass Development on or before December 30, 1977. This nonrecourse note was dated December 30, 1977, and *582 was signed by John Pfauth in his capacity as president of Compass Development, general partner of Central Associates. The terms of the note provided that the principal amount of $ 36,000, together with interest at eight percent, was payable solely out of one-third of Central Associates' monthly Adjusted Net Revenues. "Adjusted Net Revenues" was defined as Central Associates' gross revenues after the payment of the landowner's royalty and overriding royalty interests, less 15 percent. The monthly adjusted net revenues, if any, were payable within ten days after the end of each calendar month, commencing with the month ending December 30, 1977. Payments, if any, were to be applied first to interest, then to principal. The note expressly stated that in no event shall any of the limited partners have any liability for payment of the note, except to the extent that Central Associates had made cash distributions to the limited partners of amounts which were required under the note to be paid to Compass Development. Wyman and Fromkin each received $ 7,500 from Compass Development after the formation of Central Associates. The record does not establish whether these amounts received *583 from Compass Development were commissions for the marketing of Central Associates' limited partnership interests or finder's fees from Compass Development for arranging the Turnkey Drilling Agreement with the partnership. In either event the payments were unreasonable in view of the lack of arm's length dealing in this transaction among a small group of friends, relatives, and close business associates. See n. 9, supra. Wyman and Fromkin were signatories on the Howell State Bank (New Jersey) checking accounts of both Central Associates and Compass Development. One of their signatures was required on all checks of both entities. In summary, the payments under the drilling agreement were stated to be as follows: Item
Cost Per Well
Cost for Nine Wells
Intangible/Noncapital Costs:
Cash
$  8,000
$  72,000
Noncapital Note
18,000
162,000
$ 26,000
$ 234,000
Tangible/Capital Costs;
Capital Note
4,000
36,000
$ 30,000
$ 270,000
In addition to the drilling agreement, Central Associates and Compass Development executed on December 30, 1977, a document entitled Operating Agreement. *584 In this agreement, Central Associates agreed to pay Compass Development five percent of the gross production of the wells, with a minimum of $ 100 per well, per month. In return, Compass Development agreed to operate and manage the wells and to take any necessary and reasonable action in order to properly operate and manage them. The fee for each well was to commence upon its completion, and the operator was given a first and preferred lien on the well to secure those operating fees. This agreement is dated December 30, 1977, and is signed on behalf of both Central Associates and Compass Development by John Pfauth. Before being permitted to drill oil and gas wells in Pennsylvania, state law requires the issuance of a drilling permit. However, many drillers ignore the law and drill without permits. To obtain a drilling permit, the driller must submit an application along with a plat showing where the well or wells will be located. From December, 1977 through the date of trial, no drilling permits were issued for the particular area where Central Associates' leasehold interest is located. Wyman and Fromkin had never seen any permits with respect to the Central Associates leasehold, *585 and had no knowledge as to whether Central Associates or Compass Development had ever obtained any such permits. Wyman and Fromkin had visited the Central Associates leasehold with John Pfauth, Wyman in late 1980 and Fromkin in late 1978 or early 1979. They each saw what Pfauth pointed out to them as Central Associates' wells. The wells they saw were marked with initials and well numbers that designated them as Central Associates' wells. The records of the State of Pennsylvania, however, reflect that there were several old oil wells located on the Central Associates' leasehold. The record does not establish that any new oil wells were in fact drilled by Compass Development on the leasehold interest assigned to Central Associates. Assuming any new wells were drilled, there is no evidence that any such wells met the "Minimum Reserves" requirements. On its initial U.S. Partnership Return of Income, which covers the period beginning on December 30, 1977 and ending on December 31, 1977, Central Associates reported a loss of $ 234,000. The partnership had no gross income during this period and the loss claimed was entirely attributable to its deduction of $ 234,000 as intangible *586 drilling costs. The partnership calculated its deduction for intangible drilling costs based on the Turnkey Drilling Agreement dated December 30, 1977. The $ 234,000 consists of the $ 72,000 in cash and the $ 162,000 noncapital note that was required to be transferred from the partnership to its general partner Compass Development, the driller, pursuant to the Turnkey Drilling Agreement. [16] The record does not establish that Central Associates transferred $ 72,000 to Compass Development before, on, or after December 30, 1977. Further, the $ 162,000 noncapital note is not reflected as a liability of the partnership on any of the partnership returns that were filed. *587 The partnership again had no income from oil and gas wells in 1978, and its 1978 return shows a loss of $ 1,800. [17] In 1979 and 1980, the partnership reported $ 4,134 and $ 956, respectively, of gross income. However, the partnership's tax returns for these two years show net losses in the amounts of $ 2,815 and $ 3,418, respectively. The partnership did not file a return for 1981 and there is no evidence in the record that a return for 1982 or for any other subsequent year was ever filed. Thus, in the four partnership returns that were filed (1977, 1978, 1979, and 1980), the partnership claimed losses in the amounts of $ 234,000, $ 1,800, $ 1,815, and $ 3,418, respectively. On December 29, 1981, Compass Development filed in the United States Bankruptcy Court for the District of New Jersey a voluntary petition for reorganization *588 under Chapter 11 of the United States Bankruptcy Code. As of 1981, Compass Development, as a drilling company, had contracted with about 80 unrelated limited partnerships for the drilling of various oil and gas wells in Pennsylvania and Kentucky. Consolidated Energy Corp. is the successor corporation to Compass Development. Stanley Wyman is now Consolidated Energy Corp.'s president, chairman of the board and largest stockholder. Lewis Fromkin is Consolidated Energy Corp.'s vice president and a member of its board of directors. By their terms, Central Associates' $ 162,000 noncapital note due Compass Development, and the limited partners' promissory notes which had been collaterally assigned to Compass Development were due to be paid on December 31, 1982. No demand for payment of these notes was ever made by Compass Development or Consolidated Energy Corp. on either the partnership or the limited partners on December 31, 1982 or thereafter. The plan of reorganization for Compass Development, now Consolidated Energy Corp., was confirmed by the Bankruptcy Court on March 14, 1984. Under the plan, all the notes held by Compass Development were acquired by Consolidated Energy Corp. *589 In addition, the due dates of the notes were extended until March 14, 1989, five years from the date of the plan of reorganization. Also under the plan of reorganization all the interest due on the notes was waived for the period prior to the effective date of the plan, March 14, 1984. Thus, as of the time of trial petitioners had not made any out-of-pocket payments on their notes dated December 30, 1977, and the maturity date of the notes was now March 14, 1989, with interest running only from March 14, 1984. The record does not contain any evidence as to why Compass Development, a corporation which filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, never tried to enforce the notes of Central Associates or of the limited partners. The record also does not explain why Compass Development agreed to extend the maturity date of $ 162,000 in notes due to it from December 31, 1982 until March 14, 1989, and waived over six years of interest that had accrued on the notes. [18]
*590 As previously stated, Central Associates was formed on December 30, 1977. On its partnership return for the period ended December 31, 1977, Central Associates claimed a loss of $ 234,000. This loss was attributable to the partnership's deduction of $ 234,000 as intangible drilling costs. Petitioners Wyman, Fromkin, and Citrino were each allocated 11 percent, or $ 25,740, of this loss, and each deducted this amount on his individual income tax return for 1977. Each petitioner received full tax benefit from this deduction in 1977, as the partnership loss was offset against each petitioner's earned income. In his notices of deficiency to petitioners, respondent determined that petitioners failed to establish that Central Associates was an activity engaged in for profit. In addition, respondent determined that petitioners failed to establish that the alleged events, transactions, and expenditures associated with Central Associates ever occurred, either in fact or in substance. Thus, respondent disallowed petitioners' deductions of their respective distributive shares of the partnership's $ 234,000 loss for 1977. Respondent mailed the statutory notice of deficiency with respect *591 to the Estate of Robert Citrino and Mrs. Margaret Citrino on December 16, 1982. [19] The notice was mailed to 345 Centre Street, Nutley, New Jersey (the Centre Street address), which was the late Robert Citrino's former business address, i.e., the address of the law firm of Citrino, Balsam & DiBiasi. Another copy of the notice of deficiency may have been mailed to 55 Enclosure, Nutley, New Jersey (the Enclosure address), the Citrinos' last known address. Robert Citrino had died on December 23, 1981, and Samuel S. Saiber had been appointed as administrator of his estate on May 27, 1982. Some five months later, on October 28, 1982, Mr. Saiber filed a Notice Concerning Fiduciary Relationship (Form 56) with the Internal Revenue Service, listing the Enclosure address as Mr. Citrino's last address. This notice stated that Mr. Saiber's mailing address was Saiber, Schlesinger, Satz & Goldstein, Gateway I, Newark, New Jersey (the Gateway I Address). A copy of the notice of deficiency relating to the Estate of Robert Citrino and Mrs. Margaret Citrino was not mailed to Mr. Saiber at his Gateway I address, but he or his counsel received a copy of the notice of deficiency that bore the Centre *592 Street address. A petition was timely filed in this Court on behalf of the Estate of Robert Citrino, Deceased, Samuel S. Saiber, Administrator, and M. Lisbeth Citrino, Petitioners. [20] Attached to that timely petition was a copy of the notice of deficiency sent to the Centre Street address. OPINION The first issue for decision is whether the assessment *593 and collection of the deficiency determined by respondent against petitioner, Estate of Robert Citrino, Deceased, Samuel S. Saiber, Administrator, is barred by the statute of limitations. Robert Citrino died on December 23, 1981, and Samuel S. Sabier was appointed as administrator of his estate on May 27, 1982. Pursuant to section 6903[21] and the regulations thereunder, Mr. Saiber filed a Notice Concerning Fiduciary Relationship with the Internal Revenue Service on October 28, 1982. That notice listed Mr. Saiber's Gateway I Address. On December 16, 1982, respondent mailed the notice of deficiency concerning the Estate of Robert Citrino and Mrs. Margaret Citrino to the late Mr. Citrino's former business address, the Centre Street address. However, no copy of the deficiency notice was mailed to Mr. Saiber at his Gateway I address. On March 18, 1983, a timely petition on behalf of the Estate of Robert Citrino, Deceased, Samuel S. Saiber, Administrator, and M. Lisbeth Citrino, petitioners, was filed in this Court. See n. 20, supra. Attached to the petition was a copy of the notice of deficiency sent to the Centre Street address. The estate argues, however, that since a copy *594 of the deficiency notice was not mailed to the administrator of the estate at his Gateway I address, respondent is now barred by the statute of limitations under section 6501 [22] from assessing and collecting the deficiency determined against the estate. *595 Section 6212, in regard to notices of deficiency, provides that: (a) In General. -- If the Secretary determines that there is a deficiency in respect of any tax imposed by subtitle A or B or chapter 41, 42, 43, or 44, he is authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail. (b) Address For Notice Of Deficiency. -- (1) Income And Gift Taxes and Taxes Imposed By Chapter 42. -- In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, notice of a deficiency in respect of a tax imposed by subtitle A, chapter 12, chapter 42, chapter 43, or chapter 44 if mailed to the taxpayer at his last known address, shall be sufficient for purposes of subtitle A, chapter 12, chapter 42, chapter 43, chapter 44, and this chapter even if such taxpayer is deceased, or is under legal disability, or, in the case of a corporation, has terminated its existence.
Specifically, the fiduciary (the administrator of the Estate of Robert Citrino) points to the first prepositional phrase of section 6212(b)(1) -- "In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship *596 * * *." Relying upon that language, he says that such notice having been given here, that means that the notice of deficiency must be mailed to him at his "last known address" (the Gateway I address) to be valid. We disagree. If the fiduciary somehow removes himself from the purview of section 6212(b)(1), as he seeks to do, then there is no "last known address" provision applicable to him. He would then come within the general rule of section 6212(a) that respondent is "authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail." However, it is well established that those are not the only means of giving notice of a deficiency. Ordinary mail and methods other than mailing may be used to send a notice of deficiency. See Frieling v. Commissioner,81 T.C. 42, 51, and n. 13 (1983) and cases cited therein. Actual notice, such as the fiduciary received here, is sufficient. Contrary to the fiduciary's argument, section 6212 does not require personal service of the notice of deficiency. Also, the "last known address" provision is a shield or a safe harbor for respondent in case the notice is never received; it is not a sword to *597 be used by the taxpayer where he has actually received the notice of deficiency. Delman v. Commissioner,384 F.2d 929, 932 (3d Cir. 1967), affg. a Memorandum Opinion of the Court, cert. denied 390 U.S. 952 (1968); Frieling v. Commissioner, supra at 52 and n. 14. The fiduciary stands in the shoes of the taxpayer, i.e., he assumes "the powers, rights, duties, and privileges" of the taxpayer (sec. 6903), but his rights do not rise above those of the taxpayer. Here the fiduciary actually received the notice of deficiency and timely filed a petition on behalf of the estate; he is not entitled to anything more. Thus, assuming respondent was required to mail the notice of deficinecy to the fiduciary, [23] we think this case falls squarely within our line of cases where (1) the notice of deficiency was not mailed to the last known address, (2) in spite of the incorrect address, the notice of deficiency or copy thereof was actually delivered to or somehow received by the taxpayer, and (3) a timely petition was filed. The deficiency notices in such cases are valid because they serve the two functions of section 6212: (1) they notify the taxpayer *598 or his representative that a deficiency has been determined against him, and (2) they give the taxpayer the opportunity to petition this Court for redetermination of the proposed deficiency. Frieling v. Commissioner, supra,81 T.C. at 53; Goodman v. Commissioner,71 T.C. 974, 977-978 (1979); Zaun v. Commissioner,62 T.C. 278, 280 (1974); Clodfelter v. Commissioner,57 T.C. 102 (1971), affd. 527 F.2d 754, 757 (9th Cir. 1975); Brzezinski v. Commissioner,23 T.C. 192, 195 (1954). See also Olsen v. Herlvering,88 F.2d 650 (2d Cir. 1937). *599 In the present case, even though respondent failed to mail a copy of the deficiency notice to the estate's administrator, he received notice of the deficiency determined against the estate, and filed a timely petition in this Court. Thus, the deficiency notice issued to the estate served its two principal functions under section 6212. Therefore, we find that the period of limitations under section 6501(a) was suspended under section 6503(a) on December 16, 1982, the date the deficiency notice was mailed. Accordingly, the estate's argument that the assessment and collection of the deficiency determined against it is barred by the statute of limitations fails. The remaining, and principal, issue in this case is whether petitioners are entitled to deductions for their respective distributive shares of the $ 234,000 loss reported by Central Associates limited partnership in 1977. Resolution of this issue depends on whether Central Associates was an activity not engaged in for profit within the meaning of section 183. [24]Whether an activity is engaged in for profit turns on whether the taxpayer entered the activity with an actual and honest objective of making a profit. *600 Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd, without published opinion 647 F.2d 170 (9th Cir. 1981). *601 As this Court has previously stated, section 183 is not a disallowance provision, but rather allows a taxpayer to deduct certain expenses which he could not otherwise deduct. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 5, 6-7, 9 (3d Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). If an activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions *602 allowed under paragraph (1). See n. 24, supra. During the only year before the Court, 1977, Central Associates had no gross income and its lone claimed deduction of $ 234,000 was for intangible drilling costs. Thus, if we find that Central Associates was an activity not engaged in for profit, no part of this $ 234,000 would be allowable as a deduction under section 183(b).
Whether a partnership is an activity not engaged in for profit is determined at the partnership level. Fox v. Commissioner, supra,80 T.C. at 1006; Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner, supra,78 T.C. at 505. To fall outside section 183, Central Associates must establish that it engaged in its oil and gas drilling activities with an actual and honest profit objective. Fox v. Commissioner, supra, 80 T.C. at 1996; Dreicer v. Commissioner, supra,78 T.C. at 644-645. While a reasonable expectation of profit is not required, Central Associates must have had an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; *603 Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner, supra,78 T.C. at 644-645; Allen v. Commissioner,72 T.C. 28, 33 (1979); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The issue is one of fact to be resolved on the basis of all the surrounding circumstances. Beck v. Commissioner, supra,85 T.C. at 570; Flowers v. Commissioner, supra,80 T.C. at 931-932; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioners have the burden of proving the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Golanty v. Commissioner, supra,72 T.C. at 426. In making this factual determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Sec. 1.183-2(a), Income Tax Regs. *604 , Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Siegel v. Commissioner, supra,78 T.C. at 699; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is decisive; rather, we must consider all the facts and circumstances with respect to the activity. Sec. 1.183-2(b), Income Tax Regs. Moreover, all nine factors *605 do not necessarily apply in every case, and those that do not need not be discussed where no purpose would be served. Additionally, in determining whether Central Associates had an actual and honest objective of making a profit, we focus on the intent of those individuals who actually controlled the partnership's activities. Dean v. Commissioner,83 T.C. 56, 74 (1984); Fox v. Commissioner, supra,80 T.C. at 1007-1008. Respondent argues that the general partner, Compass Development, controlled the partnership's activities, citing sections 4.1 and 5.3 of the partnership agreement which provide that the management of the partnership is to be carried on by the general partner and that no limited partner shall take part in the management of the partnership.[25]
Since John Pfauth, president of the general partner, Compass Development, *606 did not testify in this case, respondent argues that petitioners have not produced any testimony regarding Central Associates' profit objective. [26] Petitioners argue that we should consider the testimony of Wyman and Fromkin on the issue of Central Associates' profit objective. Even though they were only limited partners, petitioners argue that their testimony regarding their involvement in the partnership shows that they had sufficient control of the partnership so as to make their intent relevant. Moreover, petitioners argue that they are content to rest upon the testimony of Wyman and Fromkin as to the predominant profit-making objectives of all those involved in Central Associates. Even though it is contrary to both the partnership agreement and the partnership tax returns filed to the effect that only the general partner managed the partnership's business, we will consider the testimony of Wyman and Fromkin regarding the partnership's profit objective since we are considering all the facts and circumstances with respect to the activity. See n. 26, supra. However, we again note that greater weight is given to objective factors than to petitioners' mere statement regarding *607 their intent. *608 The first relevant factor provided in the regulation is the manner in which the taxpayer carried on the activity. Sec. 1.183-2(b)(1), Income Tax Regs. The inquiry here focuses on whether Central Associates was carried on in a businesslike manner. Based on the evidence in the record, or lack of it, we must conclude that Central Associates was not carried on in a businesslike manner. The maintenance of complete and accurate books and records indicates that an activity is carried on in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Reg. In the present case, petitioners have offered virtually no partnership books or records despite having been subpoenaed to produce them. The record lacks any of the partnership's ledgers, financial records, bank statements, canceled checks, or receipts. Petitioners argue that the lack of records is "an understandable aspect of the disorder attendant upon the bankruptcy of the General Partner, Compass Development." However, Central Associates is a separate entity and given the purported involvement and control of Wyman and Fromkin over the partnership, this lack of records is not understandable. Compass Development filed for reorganization under *609 Chapter 11 on December 29, 1981. We think if Central Associates was carried on in a businesslike manner from its inception on December 30, 1977, until late 1981, petitioners would have been able to produce at least some partnership books or records, albeit incomplete. We find the fact that the general partner filed for reorganization four years after the inception of the partnership of little consequence in our determination of whether Central Associates was carried on in a businesslike manner. Thus, based on the evidence in the record we conclude that Central Associates was not carried on in a businesslike manner. Another factor we consider relevant in the present case is the expertise of the taxpayers or their advisors. Sec. 1.183-2(b)(2), Income Tax Regs. The regulation provides that preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. With regard to the formation of Central Associates, the record contains no surveys or geological reports that petitioners considered regarding the *610 potential for successful production of oil on the Central Associates' leasehold property. Petitioner Wyman testified that he was offered a number of different oil and gas leases by John Pfauth, president of Compass Development, and that he chose the Central Associates' lease due to its proximity to prior projects that had been successful. However, there is no evidence in the record as to these allegedly successful projects. The next factor we consider relevant in this case relates to the history of losses reported by Central Associates. Sec. 1.183-2(b)(6), Income Tax Regs. The partnership reported losses in each of the tax returns it filed for periods ending in 1977, 1978, 1979, and 1980. The amounts of these losses reported were $ 234,000, $ 1,800, $ 2,815, and $ 3,418, respectively. For the partnership to just break even, that is, realizing enough gross income to pay off both the $ 162,000 noncapital note and the $ 36,000 capital note, plus interest, and to cover its royalty and operating expenses, it would have had to have had in excess of $ 500,000 in gross income over its first five years. During those five years Central Associates reported gross proceeds of $ 5,090. [27] *611 Petitioners argue that this break-even analysis is irrelevant since in 1977 the country was in the midst of an energy crisis, with increasing demands for oil and increasing costs for drilling. However, Central Associates was formed December 30, 1977. Therefore, the fact of any energy crisis in 1977 was known to petitioners at the time Central Associates was formed, and allegedly was the reason for the fixed-price Turnkey Drilling Contract. We find that the record does not support petitioners' argument that Central Associates' meager production was due to the energy crisis. Instead, we think the evidence in the record supports respondent's contention that Central Associates was not formed with the objective of making a profit, rather, it was formed to create the large partnership loss reported in 1977. Another listed factor we consider relevant in the present case relates to the financial status of petitioners. Sec. 1.183-2(b)(8), Income Tax Regs. The regulation provides that *612 if a taxpayer has substantial income from sources other than the activity, this may indicate that the activity is not engaged in for profit, particularly if the losses from the activity generate substantial tax benefits. Sec. 1.183-2(b)(8), Income Tax Regs. During 1977 each petitioners had substantial income from sources other than Central Associates. Wyman was in insurance sales, Fromkin was a business executive, and Citrino was an attorney. Each deducted on his 1977 individual return $ 25,740 as his respective distributive shares of the purported loss reported by Central Associates. Since each petitioner's income from sources other than Central Associates exceeded the $ 25,740 partnership loss deducted, each petitioner received full tax benefit in 1977 from this deduction. [28] These tax benefits take on added significance in view of our doubts as to whether petitioners even made their purported cash out-of-pocket payments to Central Associates. *613 In addition to the factors above, we find the following facts and circumstances relevant to our decision. Initially, petitioners have not shown that the limited partners, other than Wyman and Fromkin, made their required cash contributions to the partnership in accordance with the partnership agreement. We find it noteworthy the only documentary evidence of the limited partners' cash contributions was copies of canceled checks from Wyman and Fromkin in the amounts of $ 8,000 each. It was Wyman and Fromkin that each received $ 7,500 back from Compass Development, which Wyman testified were "finder's fees" for arranging the Turnkey Drilling Agreement with the partnership. In view of the lack of arm's length dealing here, these payments, whether labeled "commissions," "finder's fees," or something else, are unreasonable and cast serious doubt on the alleged cash capital contributions. Moreover, petitioners have not shown that the partnership paid the $ 72,000 to Compass Development under the Turnkey Drilling Agreement. This $ 72,000 is part of the $ 234,000 the partnership deducted on its 1977 return as intangible drilling costs. Wyman testified that all of the documents, including *614 checks, were present at the "closing" on December 30, 1977, but he had no recollection of any specific checks. If the $ 72,000 had been paid to Compass Development under the drilling agreement, there should have been canceled checks to establish that fact. We find Wyman's vague, generalized, self-serving testimony does not meet petitioners' burden of showing that these payments were in fact ever made. See New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); sec. 6001. Also the five-year balloon notes, while recourse on their face, do not appear to be bona fide indebtedness. No demand for payment of either principal or interest was ever made when they matured, even though Compass Development had filed for reorganization under Chapter 11, and should have had an incentive to collect any bona fide debts that were due and owing. Instead all accrued interest was forgiven, and Wyman and Fromkin ended up in control of the successor to Compass Development. In any event, the indebtedness represented by those notes would be too contingent to be treated as "payment" of intangible drilling costs. The absence in the record of any of the partnership's financial records *615 and the lack of evidence regarding the general partner-driller strongly suggest that petitioners engaged in the expedient of drawing up papers to characterize the transactions in question as something contrary to the economic realities thereof, and did so solely to obtain tax benefits. In sum, when we consider the totality of the facts and circumstances in this case, we must conclude that petitioners have not met their burden of showing that Central Associates was formed or operated with an actual and honest profit objective. Rule 142(a). Therefore, Central Associates must be considered as an activity not engaged in for profit within the meaning of section 183. Thus, respondent's determinations are sustained. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. The cases of the following petitioners have been consolidated: Stanley Wyman and Jean Wyman, docket No. 5975-83; Lewis Fromkin and Elaine Fromkin, docket No. 29520-83. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. The Citrinos filed an amended income tax return (Form 1040X) for 1977 on May 3, 1978. This amended return has no bearing on the issues to be decided in this case. ↩
4. The terms "partnership," "limited partnership," "general partner," "limited partners," "assignment," "subscription agreement," "notes," "turnkey drilling agreement," "operating agreement," "collateral assignment of note," "lease," "interest," "transfer," "payments," and "contributions," and all derivatives of those terms are used solely for convenience in describing the purported transactions. These terms are not intended as determinations or conclusions as to the legal effect of these various documents and transactions. ↩
5. The Agreement of Limited Partnership, dated December 30, 1977, gives the principal place of business of Central Associates as Pittsburgh, Pennsylvania, whereas the Assignment of Oil and Gas Lease, dated December 30, 1977, gives the address of Central Associates as Cranford, New Jersey, using the same address as that for Compass Development. ↩
6. However, the general partner was prohibited, without the unanimous consent of the limited partners, from using any asset of the partnership for any purpose other than as provided for in the partnership agreement, and from making any income tax election which, in the judgment of the partnership's accountant, was not in the best interests of the limited partners. ↩
7. Central Associates' U.S. Partnership Returns of Income (Forms 1065) for both 1977 and 1978 state that each limited partner's time devoted to the partnership's business was either zero percent or none. ↩
8. While these are the stated limited partners' percentage interests as they appear in the schedule of capital contributions, section 7.2 of the partnership agreement states that the partnership shall elect to expense all noncapitalized costs, and that these items shall be allocated 99 percent to the limited partners and one percent to the general partner. Whether this allocation has substantial economic effect within the meaning of section 704(b) and the regulations thereunder has not been raised as an issue in this case, and we do not address the matter.↩
9. While Wyman testified generally that all documents, including checks, were present at the "closing," he had no recollection of any particular check or checks. We do not accept his testimony, and we do not accept the explanation that Pfauth's later bankruptcy somehow accounted for the missing documents. Any such canceled checks would not be in the records of the partnership but in the records of the individual limited partners. Accordingly, on this record, we can find payment only of the $ 16,000 by Wyman and Fromkin, and as will be indicated below, they received most of that back from the general partner. ↩
10. Under the partnership agreement each limited partner was to execute a promissory note as part of his capital contribution, in the form set forth in Exhibit A thereto. Each limited partner was to deliver his note on or before December 30, 1977, "or such extension(s) not to exceed a total of 90 days as General Partner shall have designated * * *." Copies of only the notes executed by petitioners Wyman, Fromkin, and Citrino are in the record. The promissory notes executed by petitioners are not dated. Except for the signature lines, the notes executed by petitioners are identical. The note executed by Stanley Wyman is reproduced below, in its entirety. EXHIBIT A PROMISSORY NOTE
FOR VALUE RECEIVED, on December 31, 1982, I promise to pay to the order of Central Associates Eighteen Thousand Dollars ($ 18,000) Dollars (sic), together with interest at the rate of Eight (8%) Percentum per annum, at the Livingston State Bank, 313 Mt. Pleasant Avenue, Livingston, New Jersey. Presentment, dishonor, protest and notice of any of the foregoing are hereby waived. Signed Stanley Wyman (L.S.)
Printed Name: Stanley Wyman ↩
11. Section 7.2 of the partnership agreement stated that any distribution which would otherwise be made to a limited partner shall first be used to prepay his note, applied first to accrued interest, then to principal. However, no distributions, and therefore no applications against their notes, were ever made to or for the limited partners. ↩
12. A producing well is one from which oil is extracted and an injection well is a support system that reinjects the by-product of natural gas to force out more oil. ↩
13. The drilling agreement required Compass Development to engage a recognized logging company that would be agreeable to both Compass Development and Central Associates. The logging company's job would be to log each oil-producing well with electric log, caliper and density and nuclear log with guard and caliper, and, to log each injection well with gamma and caliper log. There is no evidence in the record as to whether any logging company was ever engaged. ↩
14. Thus, the sum of the cash payment due Compass Development for all nine wells would be $ 72,000. We note that under the partnership agreement the cash portion of the limited partners' capital contributions would also be $ 72,000. ↩
15. Central Associates' $ 162,000 note recites that the limited partners' notes (which it describes as Subscriber Notes) are prepayable under certain conditions. However, the limited partners' notes that are in evidence do not so indicate. See n. 10, supra. The only mandatory prepayments would be those paid from production from the wells. See n. 11, supra.↩ Assuming the limited partners for some reason chose to prepay some portion of their notes or that there were production payments, presumably Central Associates would be bound under the terms of its note to apply such prepayments to prepay its note, applying any such prepayments first to interest, then to principal. If Central Associates failed or refused to apply such prepayments to prepay part of its $ 162,000 note, that would not accelerate payment of the limited partners' notes. 16. The parties argued and briefed various issues in regard to the deductibility of prepaid intangible drilling costs (IDC) under a turnkey drilling contract. This case does not involve whether or not there can be prepaid IDC under such a contract. See Keller v. Commissioner,79 T.C. 7 (1982), affd. 725 F.2d 1173 (8th Cir. 1984). Here, the question is whether any payment of cash was actually made in 1977. Also, here the bulk of the "payment" was made by notes. Since the partnership appears to have been on the cash basis, those notes probably would not constitute payment of IDC in 1977. See Levy v. Commissioner,732 F.2d 1435 (9th Cir. 1984), affg. T.C. Memo. 1982-419↩. In view of our disposition of the case, we need not address these and other arguments of the parties as to basis and the amount "at risk" under section 465. 17. This $ 1,800 loss claimed was attributable to depreciation taken on drilling equipment allegedly owned through the partnership's issuance of its $ 36,000 capital note to Compass Development. That note could not be assigned, negotiated, or otherwise transferred and was payable solely out of one-third of the partnership's monthly "Adjusted Net Revenues." ↩
18. That the Bankruptcy Court approved the plan of reorganization furnishes no explanation. The individual limited partners were not bankrupt or otherwise involved in the bankruptcy except as debtors who allegedly owed the bankrupt corporation money on their notes which allegedly were due and payable. ↩
19. Mrs. Margaret Citrino and M. Lisbeth Citrino are one and the same. ↩
20. The notice of deficiency was mailed on December 16, 1982. The petition was received by the Court on March 18, 1983, which was the 92nd day after mailing of the notice. See sec. 6213(a). However, the envelope in which the joint petition was mailed bears a handwritten notation, apparently be petitioners' counsel, Winthrop Drake Thies, that the envelope was "posted" at 10:50 p.m. on March 15, 1983, the 89th day. More importantly, that envelope bears a clear postmark date of March 16, 1983, the 90th day from the date of mailing of the notice of deficiency. Accordingly, such timely mailing constitutes timely receipt by the Court, and the petition was thus timely filed. Secs. 6213(a), 7502; Kahle v. Commissioner,88 T.C. 1063↩ (1987). 21. Section 6903 provides: Sec. 6903. NOTICE OF FIDUCIARY RELATIONSHIP. (a) Rights and Obligations of Fiduciary. -- Upon notice to the Secretary that any person is acting for another person in a fiduciary capacity, such fiduciary shall assume the powers, rights, duties, and privileges of such other person in respect of a tax imposed by this title (except as otherwise specifically provided and except that the tax shall be collected from the estate of such other person), until notice is given that the fiduciary capacity has terminated. (b) Manner of Notice. -- Notice under this section shall be given in accordance with regulations prescribed by the Secretary. ↩
22. Section 6501(a) provides generally that the amount of any deficiency in income tax shall be assessed within three years after the return was filed. The mailing of a notice of deficiency under section 6212(a)↩ suspends the running of the period of limitations provided in section 6501. Sec. 6503(a). 23. The effect of filing a Notice Concerning Fiduciary Relationship is that the fiduciary assumes the powers, rights, duties, and privileges of the person the fiduciary is acting for. See n. 21, supra.↩ Thus, any statutory notice of deficiency concerning the person the fiduciary is acting for shall be sent to the fiduciary. See also S. Rept. 52, 69th Cong., 1st Sess. 30-31 (1926), 1939-1 C.B. (Part 2) 332, 355. Respondent contends, however, that the Notice Concerning Fiduciary Relationship was not filed in accordance with section 301.6903-1(b), Proc. and Admin. Regs. This regulation requires that the notice be filed with the district director for the district where the return of the person for whom the fiduciary is acting is required to be filed. Respondent argues that the estate has not introduced any evidence that the notice was filed with the Newark District Director's Office, as the regulation requires, and raises the possibility that the notice was perhaps filed with the Holtsville, New York office. We note that respondent does not offer the Court any evidence on this issue either. We agree with respondent, though, that based on the record as a whole, it cannot be determined with which office the Notice Concerning Fiduciary Relationship was filed by Mr. Saiber. However, we will assume that the fiduciary complied with the regulation. We still hold, for the reasons stated below, that the failure in this case to mail a copy of the notice of deficiency to the administrator (Mr. Saiber) does not bar respondent from assessing and collecting the deficiency determined against the estate. 24. Section 183, in relevant part, provides: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.
In addition to his determination that Central Associates was an activity not engaged in for profit, respondent also contends that the transactions entered into by Central Associates were devoid of any economic substance and served no purpose other than to create artificial tax deductions for petitioners. The parties' briefs contain arguments on both the section 183 and the economic substance issues, as well as related questions pertaining to the timing of the partnership's deduction of the intangible drilling costs (sec. 461), whether the deduction resulted in a material distortion of income (sec. 446(b)), and whether the partnership's $ 162,000 note was a bona fide liability. See also n. 16, supra.↩ However, since we conclude that Central Associates was an activity not engaged in for profit, we need not address these other issues. In any event, our final conclusion would be the same even if we considered all of these other issues. 25. Respondent also cites the Revised Uniform Limited Partnership Act, which provides generally that limited partners wishing to retain their limited partnership status, with its concomitant limited liability, do not manage or act for the partnership. See sec. 303, Revised Uniform Limited Partnership Act (1976). ↩
26. There are several areas where the testimony of Mr. Pfauth might have shed some light and might have furnished substantiating factual information to flesh out petitioners' rather vague, generalized, self-serving testimony. On brief, both parties complain about the other party's failure to call him as a witness, and ask the Court to draw inferences from the other party's failure. In his pretrial memorandum, respondent listed Mr. Pfauth as a witness, but did not call him to the stand. When respondent on brief asked the Court to draw an adverse inference from petitioners' failure to call him, petitioners understandably objected. Petitioners, however, accuse respondent of "ill-becoming 'game-playing'" and "near-duplicitous conduct," insisting that respondent had "firmly and unconditionally promised" to call Mr. Pfauth as a witness. It was respondent's prerogative not to call him as a witness. The purpose of identifying witnesses in advance is to avoid surprise at trial. If a party is satisfied with the record, he need not call a listed witness, so long as the other side is not unfairly deprived of the opportunity to call the witness. On brief petitioners seem to suggest such unfair deprivation, urging that Mr. Pfauth was in respondent's "'custody,' as it were," was in respondent's "possession" or was "secreted" during the trial by respondent. Apparently, this means Mr. Pfauth had been subpoenaed by respondent and was available on a telephone call. There is no indication that respondent's counsel refused to give petitioners the number at which Mr. Pfauth could be reached, or otherwise impeded any effort by petitioners to call him to the stand. The Court would not countenance any such improper conduct by any member of its bar. At any rate, the Court was not advised of any problem during the trial, but would have ordered Mr. Pfauth's appearance if requested to do so by either party. It appears that petitioners too chose not to call Mr. Pfauth as a witness, which is also their prerogative, but which does not change their burden of proof. Viewing this and other arguments on brief as a whole, the Court thinks both parties perhaps went a bit beyond zealous advocacy in their briefs and provided the Court with a bit more warmth than light on the issues. In any event, the Court will not draw any inferences from the failure of Mr. Pfauth to testify and will decide the case on the basis of the entire record that the parties chose to present. ↩
27. We use the five-year period as a measuring point since both the partnership's notes and the limited partners' notes were five-year balloon notes. ↩
28. The $ 25,740 deduction reduced the Wymans' 1977 adjusted gross income from $ 35,982 to $ 10,242; it reduced the Fromkins' adjusted gross income from $ 45,128 to $ 19,388; and it reduced the Citrinos' adjusted gross income from $ 62,276 to $ 36,536. ↩